23-151. Just have a pause for a second. I'm just checking on whether we're getting a little audio feedback from the microphones. If we continue to do that, I might hit a pause, regardless of who's talking at any given moment, so we can adjust the cords. But let's see how we do with our technical issues. So we have Mr. Acharnia. Good morning, your honors, and may it please the court. Please. As a small, sparsely attended protest in Stanford, Connecticut, against police brutality was winding down, Officer Stephen Estabrook slammed into my client, lifted her up by her bra strap, threw her to the ground, and inflicted significant injuries. I'm sorry, sir, would you mind tilting the microphones upward? I think it would help us. If you could just keep your voice up so we can hear you. We want to make sure we hear all of the arguments you're making. Yes, your honor. Is this audible? That's better. Thank you. Great. At this point in the case, only two questions really remain. First, given the record evidence, the summary judgment standard, and the burden shifting in qualified immunity, was Officer Estabrook entitled to the inference that a Code 30 was an urgent call for help that demanded an emergency response? And second, even if that is what Code 30 meant, was he therefore entitled to use unlimited force? The answer to both questions is no. The record evidence on what Code 30 means is equivocal at best. And even if it means what Officer Estabrook says it means, this court's precedents have clearly established for decades that even under heightened threat or emergency, an officer's use of force must still be proportionate and not gratuitous. Bulldozing my client at full speed was both disproportionate and entirely unnecessary, so this court should reverse and remain. It's worth starting with just how much at this point in the case is undisputed. It's undisputed that Officer Estabrook used significant force, that he did so intentionally, that my client wasn't resisting, had committed no crime, and posed no threat, that the protesters were nonviolent, that Officer Estabrook made no effort to limit or temper his use of force, and that he had plenty of less aggressive options available for his objective. His sole justification for using the degree of force that he did is the Code 30 call. But the meaning of Code 30 from the record is equivocal. The briefs talk about Captain Hahn's declaration and how it equivocates on what Code 30 means. It says Code 30 means officers need assistance, whereas Code 3 requires an emergency response. But putting that to one side, this court can also just look at how all the other officers on the scene responded, because they all heard the Code 30 call too, and none of them treated it as if it required them to run in and start knocking heads. No one pulled a weapon. No one used force at all. The most anyone did was sprint to the scene. One officer pulled out a baton. There's even a command to put the batons away. Exactly right, Your Honor. So no other officer responded with the kind of force that Esterbrook used. And given that the burden is Esterbrook's unqualified immunity to establish that Code 30 required him to respond with such urgency, he hasn't met that burden here at the district court in Arden City. In terms of this case and looking at the district court's decision, it seemed that the district court focused on the call for officers in distress and distinguishing it from the Idre or Idry case where there are repeated, having watched the video multiple times, there are repeated instructions to step aside, to get on the sidewalk, and the officer doesn't come in until the distress call is called. Doesn't that change the analysis? You're speaking about the conduct of the officers that were already there. They don't have the same information as the officer that's being called in to assist other officers. Doesn't that make a difference? A few responses to that, Your Honor. First, I think they had exactly the same information. They all heard the Code 30 call as well. Some of them weren't on the scene. No, but in terms of what was happening on the ground at the moment, this officer is rushing in, right? He doesn't have the same level of information that the ones that are calling for help were there. Would you agree with that? Yes, Your Honor. I see. I understand what you're saying. Does that—to what extent does that—shouldn't that make a difference? It seemed like the court was looking at his subjective view of the level of violence or the level of force that he needed to address the call to—the distress call to come help officers, which I guess Captain is at home or . . . I'm not home. . . the one in charge called a call 30 or a call 3, and that that was known to them to be an officer in distress come help. Do you see what I mean? That's a big distinction between this case and the court went in detail distinguishing this case from Idre, whereas in Idre, the peaceful demonstration, no orders were given to step aside, get on the sidewalk, don't block the road. Here, there are repeated instructions to step aside, asking for compliance. Doesn't that make a difference where an officer receives a call that another officer is in distress or to come help?  First, the idea that a code 30 was officers in distress come help is the thing that Officer Estabrook has failed to prove on this record. That's an assumption the district court made, and it footnotes that. It says Officer Estabrook doesn't really say what code 30 means. I'm going to assume it means the same thing as code 3, so that what code 30 means is something that he has to prove. Wasn't there evidence from the officer that that's what that code meant? When it's called? No, Your Honor. The evidence in the record is, and I'll just quote from Hahn's declaration, code 30 means officers need assistance, and in his deposition, he says, we have three levels of assistance. We have routine. We have somewhat urgent. We have very urgent. Code 3 is emergency response. Code 30 is just assistance of some sort. It could be anything from a flat tire on the side of the highway to officer down. And what exactly code 30 means is something that Estabrook has to prove because it's his burden and because he's a moving party. But even a couple other things. In Eadry, in fact, the officers did say, did ask the crowd to move back, and the crowd didn't move back. There's actually a one-to-one correlation between the facts of Eadry and the facts here. In Eadry, the officers arrested a protester and made the crowd hostile. In Eadry, as here, the crowd sort of circled up, started demanding that the officers release the person they were arresting. In Eadry, as here, the officers said, get back, get back, and the crowd didn't listen. I didn't read Eadry to say that. I thought Eadry was a peaceful demonstration. There was no evidence whatsoever that they were told to step on the sidewalk or given instructions. When I watched that video, they're repeatedly told to please step aside, get on the sidewalk, get on the sidewalk. So I don't see that distinction. Also, Eadry was a motion to dismiss, correct? And the court went on to say, look, at a motion for summary judgment where more evidence is gathered, that may make a difference. So it's a different posture, right? Yes, Your Honor. So in Eadry, they were told to get back, and I think that will be on page 537 of that case. In addition, someone there may have thrown a glass bottle, and nothing like that is present here. I thought, yeah, in Eadry, though, we completely downplayed that. We said one of the plaintiffs claimed that they heard glass breaking somewhere but that there was no evidence of a bottle having been thrown at anybody. I mean, we just kind of brushed that aside. That seemed like it was a big nothing. We said it was a big nothing. That's true, Your Honor. That is what the court said. Ultimately, I think that's the legal conclusion. Even given all the facts in Eadry, and they were told to get back. They didn't get back. They were yelling at the officers. They were demanding that the officers release the person they were arresting. Even so, what the court said is just because the protesters were hostile doesn't mean they were violent. I'd like to give you a chance to talk about the second argument because it seems to me that I take your point, and I think the simplest way of making it is to say there's a footnote in the district court's opinion where the district court says explicitly, I'm making this assumption, and you're saying you're not supposed to make assumptions in favor of the moving party at summary judgment. It's as simple as that. But that's a somewhat technical argument, I think. He is, at least to the extent that Estabrook is, responding to some kind of call that says get here on the double. He gets there. I'm more concerned about what happens after that, frankly, because I read the district court's opinion, and I imagined a demonstration sort of like Eadry. That's because I'm a New Yorker, and when I hear a demonstration, I think of thousands of people in the streets marching en masse, and I kind of imagine if somebody gets to the back of that and obviously gets to the back of that and thinks he needs to get to the front of it, he's got to shove his way through a lot of people. Then I look at the video, and what I see in the video is it's like a dozen or so people scattered all over the street. He can go, if he wants to get through that crowd, he doesn't have to be an NFL star broken field runner to find a way to get where he wants to go. And what he does is he charges directly at people and starts pushing them down. Well, I don't know where he's going or why he's going there. And then he picks up the plaintiff, picks her up, and more or less, and you can't actually... She doesn't fly through the air. Maybe he's carrying her the whole way. It's a little obscure in some of the videos. But she winds up on the ground, what looks like 10 feet from where she got hit by him. And he doesn't just shove her aside. He doesn't push the tall guy into her, and then she falls down. That narrative is just false. You can clearly see that he grabs her by the scrap of either a bra or an under T-shirt, and the scrap of the T-shirt, and physically deposits her forcibly onto the ground quite a distance from where he picked her up. So I think you'd like to spend some time talking about what disputed issues of fact there are with respect to what he did, even assuming that he's coming to an emergency. That's exactly right, Your Honor. I'm not sure if there are any disputed facts about what he did at this point. Well, maybe there are undisputed facts, but it doesn't sound to me... When I read the district court opinion, I had a very different picture of what was going on there. Maybe that's my supplying things from my sense of what big demonstrations look like. But I had a very different sense after reading the district court opinion of what had happened than I did when I looked at the videos. Yes, Your Honor. I think the disputed thing is whether Estabrook needed to go through that knot of people. And on page 25 of the opening brief, there's a still frame from his perspective that shows it's a small knot of people. He's got paths on either side, and he decides, he chooses, to run directly at that knot of people and start throwing people around. Now, this court's cases have been clear that even under some exigency or threat, an officer's use of force must still be proportionate and not gratuitous. And this court has said that there's no license to use force without limit. Nothing stopped him from running around those officers, that knot of people. Nothing at all stopped him from issuing a warning. I do see that my time is up, so I'll reserve the rest for rebuttal. Very good. Thank you. We'll see you again shortly. Why don't we hear from counsel for the appellee, Attorney Coughlin. May it please the court. My name is Barbara Coughlin. I represent the defendant, officer for the appellee, Officer Steven Estabrook, in this case. To begin with, Your Honor, I'd like to point out that it is undisputed from the record that the Code 30 was a serious call. Eaton herself admits that Hahn and Noto, two senior officers, one was a captain, one was a lieutenant. The evidence is clear. They had been on the job for many years. They called the Code. Now, whether the Code is a 30 or a 3, it's clear if you look at Hahn's affidavit  that it was called because he was concerned about officers' safety. He says that in the statement of facts, number 35, it's JA366. I'm looking at Eaton's response to that because she admits it. He called it because he was concerned about officers' safety. So whether it's a Code 30 or a Code 3, it doesn't matter. That was the basis for it. And from Estabrook, he said that these calls are rarely made. That's his testimony. He says it in his deposition that they happen maybe once a year. All officers are to respond. And when Eaton's attorney mentions that Hahn says that officers need assistance can be any kind of call, a call for changing a tire, that's clearly not the case here if you look at his deposition. What assistance is he providing to whom when he arrives there? He is under the impression that the officers are in need of everyone in the police department responding. Estabrook has seen... And doing what? Because again... He doesn't know... I think from his testimony, the impression I got was sort of this is Custer surrounded by hostile forces and he has to get through the hostile forces to rescue the beleaguered police. I think that's partly it, Your Honor. He needs to get there. But when he gets there and he sees what he sees, based on the video, where is he going and who is he looking to assist and who is beleaguered, the fact that there are officers... Suppose there were officers somewhere in danger, in physical danger under assault from some demonstrator, which I suppose could be the case but there's nothing in the video that suggests that. I don't see him heading towards anything that looks like that. I see him charging into people who are standing there, not doing anything in particular, and throwing one of them to the ground. And if he needed to get past those people, he could have gone this way and he could have gone that way. He doesn't need to go through them. And he doesn't go through them. He knocks them down. And that's what it is. So I think, Your Honor, that what we have here is an officer acting in a tense situation. He has to make a very quick decision. He understands from the call that the officers in need are over by the target. His car is kind of diagonal from the target. That's where he's headed. That's what he testified to. He's headed to the officers in need. It's also important to look back to what happened prior to this time. And these facts are admitted by Ms. Eaton in the Statement of Facts, JA 368, around there, where it's talked about that the protesters were unruly throughout the day. They had banged on car windows. They had Eaton testify, I'm sorry, Esterbrook testified that the protesters said, we're going to kill the cops. There's a lot of things that preceded this. And then Esterbrook gets a call that officers are in need. He knows that he needs to get to them quickly. And that's what he's attempting to do. Well, he doesn't know what he needs to do when he gets there, but he knows that they've called a code, Code 30, Code 3, called by two senior officers, and that they need him to appear. And that's why he acts in such haste and makes the judgment that he makes. Well, he could be in haste. I guess I'm still having trouble because, and maybe I'm fixated on the wrong thing, I suppose, but I imagined that this was going to be a pretty easy case because he has to get there, and there's a mass of demonstrators. Turns out, ain't no mass of demonstrators. It's a pretty sparse crowd, and it looks pretty easy to get where he might be going without going sort of out of his way to use physical force against people who aren't doing anything that threatens anybody. Your Honor, I don't disagree with that when you look at the video after the fact, and particularly when you take a screenshot, screenshot, screenshot. Yeah, you have to slow it down a little bit just to even see what is happening. I believe one of those videos that are in evidence, there are three, one of them is his body camera, so you're actually seeing his angle of view, and that's from which I see a path to where there appear to be officers. The officers are on top, but the officers are handcuffing somebody. I suppose they could need assistance. One could imagine that, but there seem to be pretty clear ways to get there without charging into these people and actually distracting yourself from getting there and instead bashing some heads, in effect, of people who are there. They happen to be there. Yes, Your Honor. I think from his perspective, and as Judge Tan mentioned earlier, he doesn't know what's there when he gets the call. He doesn't know what's there until he gets there, and you can see it on the video at that point. I just wanted to mention about the difference between Edry and this case, and I think they're significant, and I think they're important. I don't think there is any established law that prohibits Esther Brooks' actions in this case. Importantly in Edry, the purpose of using that force, the long-range audio device, was to disperse protesters. That was it. So the court found that the severity of the security issue problem wasn't high. The purpose here in using his hands by Officer Esther Brooks was to move through the protesters to get to officers in need. He was... I'm sorry. In this case, the district court denied the motion for summary judgment on the issue of whether Eastbrook employed excessive force in violation of the 14th Amendment. The court actually said this was excessive force, or there's at least a question of fact, but went on to decide it on qualified immunity and whether or not that use of excessive force was... the need for the use of excessive force was reasonable or not. So that's the focus of what we should be looking at, is whether or not there's a question of fact of whether he personally believed the use of force, that level of use of force was reasonable or not. Would you agree that that's what... is at issue here in terms of the district court opinion? Partly, Your Honor. I think what the district court did was that the court found that there were disputed issues of fact with regard to the excessive force, whether there was a constitutional violation as to excessive force. And there were some disputed issues of fact, perhaps. That's what she found. We had argued differently. There were certain facts that weren't disputed, such as the code being a serious call, the fact that Ms. Eden had not gotten back when she was told to get back, that she was in the road where she wasn't supposed to be. These are just undisputed issues of fact. And then the court went on to rule that even based on this, there's no case precedent that would have alerted Officer Estabrook that his conduct under these circumstances was a violation of... That's really where the trial court hangs its hat, right? Because this particular individual that was injured was actually trying to get the court, the crowd, to disperse. Because actually, that's one of her claims. And you can see that on the video. She's trying to get the crowd under control. But that is... I read the court's response to say, but the officer coming in, this defendant, didn't know that, didn't know that she was actually trying to assist the officers as opposed to the other people there. I think that's accurate, Your Honour. And I think there are issues of dispute as to whether she was assisting or not. But, yes, I think that's what the court found in that case. I wanted to... And just to be clear, the question is not what this officer subjectively thought, but what an objective officer would have known had this hypothetical officer known exactly what Officer Estabrook knew, right? That's correct. We're not asking for what his idiosyncratic read of the situation would have been, was. You know, Officer Estabrook could be unusually perceptive or unusually obtuse. We don't really care. We're asking whether a reasonable officer, knowing what Estabrook knew, would have been unnoticed that what he did was unconstitutional. That's the test. I mean, just to frame it, right? Do you agree with that? I agree with that, Your Honour. And I think, therefore, that's why all the things leading up to his actions are important, because a reasonable officer would know all the things that Officer Estabrook did. Not that subjective, but a reasonable. Whether his use of force was, in fact, gratuitous. I mean, I don't, again, when I was thinking that this was a case about having to push your way through a crowd, it seemed to me that it's a pretty good argument that there is actually no similar case that you could point to as to how much force you need to use if you have to push through a crowd to get somewhere that it's urgent, you as an officer, to get someplace that it's important for you to get to for the safety of officers. That's not Idre. Idre doesn't say anything to that. Idre talks about using a rather dramatically different style of force, shooting off, in effect, a noise cannon that can injure people's eardrums just to get them to go away. That's a very different case than what physical degree of force do you need to use to get where you're going. But it seemed to me that the video creates an issue of fact as to whether any reasonable officer would have thought he needed to push through a crowd or whether a reasonable fact finder could conclude that this was just a gratuitous, these guys are bad guys, they're causing trouble for my colleagues, and I'm just going to knock them down. So I think, Your Honors, with regard to that and following up on it, the appellant points to a number of other cases when, having conceded at some point that perhaps Idre doesn't control this case, points to other cases and says that when there's a threat or there's an urgency, those cases say you can't use the amount of force that was used in this case. But none of those cases that are cited are relevant at all. The Lennox case, the Jones v. Trebek case. But doesn't it have to be a necessity of some kind to use force, or at least for qualified immunity, that a reasonable officer could think that he needed to use some force in order to get where he's going, as in pushing through a crowd. You may have to get a little rough just to part the borders. But when you look at this case, I just don't see, frankly, I think a reasonable fact finder, if I were the fact finder, I would say he didn't need to do that, that that's not the situation that he confronted. And if it were gratuitous, if it were just, you know, I'm mad at these guys because they're cursing the cops and saying nasty things about cops, and I have an excuse to sort of beat them up, any reasonable officer knows you can't do that. Yes, Your Honor. Isn't that the fact question? And maybe there's not enough evidence of that. But I look at the video, and I can imagine a reasonable jury finding exactly that. I believe, Your Honor, that there's no particular case on point that prohibits the conduct here. It's an unusual situation. It's a protest. No one's being arrested. Edry is the only case that really talks about a protest in these circumstances. This is distinctly different than Edry. I think that force could be used under these circumstances based on the existing precedent, and the existing precedent at that time allowed Officer Osterbrook to believe that his conduct was lawful. Okay. Thank you very much. We appreciate that. Why don't we hear from counsel for the appellant? You have reserved three minutes for rebuttal, if there's anything you would like to add. Thank you, Your Honor. I'll start with the difference, or lack thereof, between Edry and this case for qualified immunity purposes. In Edry, the defendants made the same argument that Officer Osterbrook was making here. They said, look, you've got these substantive due process cases that talk about excessive force, but none of them applies in the crowd control context, therefore the officers here couldn't possibly have known that those precedents would govern their conduct. And what this court said there is that qualified immunity is not so stingy. That's such a narrow interpretation of prior case law. And to be sure, the Supreme Court has said that prior case law must be interpreted in a fact-specific way. Yeah, I have to say that's one of those lines that sounds good, but it's a Goldilocks principle, right? We're not allowed to construe our precedents too generally, but we also can't construe them too narrowly. We have to construe them in exactly the right amount. So, I mean, it sounds good in any given case. We're going to say, you know, if the plaintiff loses, we're going to say, well, the district court construed it too narrowly. And if it's the other way around, we say you construed it too generally. That's true, Your Honor. I think, but Edry has a little bit more than just the Goldilocks principle there, because it applied Johnson, which is a case about how much force you can use against a student in a school, to the crowd control context. And it said that governed the officer's conduct here. That's quite a leap. And if Johnson could govern the officer's conduct in Edry, then Edry can certainly govern Officer Estbrook's conduct here. Just because there's some element of novelty doesn't mean that an officer is automatically entitled to qualified immunity. And I just want to address something my friend on the other side said. We certainly don't concede that Edry isn't sufficient. I think Edry, combined with the other cases, over determines the outcome here. In cases like Lennox and Jones and Frost and Sullivan, all of these cases show that in a variety of contexts, across a broad spectrum of cases, an officer's use of force must still be proportionate and not gratuitous. One other thing I want to address, my friend on the other side said that the situation here was tense and rapidly evolving, which is quoting language from the Supreme Court. But the thing is, it wasn't. It was calming down. By the time he arrived, the officers, with my client's help, had stabilized the scene. The question is what was known to Estbrook. I mean, if he had been in receipt of information that was 100% false, that police were being attacked, when in reality they were all sitting around happily playing pinochle with the protesters, it wouldn't matter at all, right, if he reasonably thought that the officers were being attacked. So I don't think it's helpful to say, unbeknownst to Estbrook, everything was peachy keen. If you're saying that when he got to the scene, it was obvious that everything was peaceful, that that's a different situation, but whether things had evolved in one way or the other, it doesn't really matter. The question is what did Estbrook know. I agree entirely, Your Honor. And I am saying that once he got there, my client was standing still. The other person he pushed was standing still. The protesters were milling about. This wasn't a situation that was rapidly evolving. And he had five seconds. I count five seconds from when he exited the car to when he barreled into my client. That was his decision to turn a calming down situation into a tense one. Well, again, you just said calming down. But the question is whether he had reason to know or believe that it was calming down. I think he had five seconds to see that, Your Honor. That's not very much. We're talking about split-second decisions the police have to make. So the one thing we know is he got a call, Code 30. And obviously you dispute the idea of whether it was Level 1, 2, or 3. And maybe I understand your argument that Code 30 can also mean something as simple as, hey, come on over here. And I want to talk to you at some point. I might need a little help. And that may not necessarily convey a sense of urgency. I understand that argument. But if you accept the fact or if you accept the notion that it is a call for help and he had only five seconds to make a decision, maybe it's not technically a split-second decision. By that, we literally mean less than a second to make a decision. But five seconds is not very long. What I mean by that, Your Honor, is that he wasn't responding to anything that anyone else was doing. I don't know if we watched the same video, but the video clip I watched, people weren't standing still. They were coming forward towards the officers. Somebody was saying, hold the line, hold the line, with cameras or phones, iPhones, yelling obscenities, running in and out. And your client wasn't standing still. Now, I understand the claim. She was trying to get the crowd back and, you know, onto the sidewalk. But folks weren't standing still. I think there's a timing. Holding up protest signs. I think there's a timing issue, Your Honor. Sure, things were definitely – she was doing all of this. By the time Ashbrook arrived, she was elsewhere. She was away from there. She was talking to her old neighbor. She was standing still. Those two things have a different timing. She's standing talking to a guy, a tall guy. Yeah. His name is in the record. Quinn. Quinn? Yeah. Yeah, she's talking to him. And, you know, my issue is not with what's going on in general. It's almost as if he goes directly for the people who are causing the least trouble. And if the idea is he has to get through them to get somewhere else, I don't see that on the video either. But that's my focus. You can hear a lot of noise, though, even when that's going on. There are people shouting. There do seem to be officers engaged in arresting somebody behind where your client is. There's a lot going on on the scene. I think it's hard to dispute that. You know, it's not like everything is over. Maybe that's one possible interpretation, but it's hard to say that Ashbrook should have known that. That's fair enough, Your Honor. And even if he thought that there were officers in need on the other side, even if he thought there was no way to get around my client and the person she was talking to, even if he thought he had to use the maximum possible force to get to the other side, none of that stopped him from issuing a warning. And that was the thing that this court focused on in Eadry, the fact that the officers did what they did with no warning. Oh, but there was no—but, again, there—I understand your key argument. I guess I'm not so convinced by the analogy to Eadry because I thought the whole point of Eadry is, look, these protesters were not bothering anybody. There was no reason to think they were bothering anyone or creating a danger. The police just all of a sudden unleashed the noise cannon without any warning. But, again, if one accepts the principle here that a reasonable police officer in Ashbrook's position thought he had to get to the other police officers, now you have a fact that's completely distinct from Eadry where it was just gratuitous. Like, why did they tell everybody—why did they set off a noise cannon? Why did they need anybody to move? Here, all of a sudden, we do have at least the Code 30. And, again, I understand your argument that it may not reflect the severity of the need that Estabrook is claiming, but you do have a need, whereas in Eadry we said they were not going to do any of this. If I may, Your Honor. Yes. On page 530 of Eadry, I really—if the Court would re-read that. The facts there are really quite similar to here. There was an arrest. There were protesters yelling at the officers, demanding that they release the arrestee. It was— But we made such an—we made such an emphasis—we put such an emphasis on the fact that, yeah, yeah, yeah, they were asking, but it was from a distance. There was no indication that anybody was going to come. I mean, we downplayed that. It's true. To an incredible degree, maybe to a wrongful degree, honestly. The other difference in Eadry, though, is what the force is, which is something quite different than physical force. I didn't think there was—I didn't think the rationale of Eadry was they had no reason to disperse this crowd at all. I thought the question was you're using this rather dramatic thing, and you're not even telling people you're going to do something that's really pretty serious. Imagine this is going to push you away or something. We're going to damage people's eardrums, and there's no warning before doing that. But one way or the other, it's hard for me to say this is just the same case. This is a—it's a rather different situation, and I'm not sure how much help anybody gets out of it. But we do appreciate your argument. We understand the analogy that you're trying to draw, and we thank you. We thank both sides for very helpful arguments. We will take the case under advisement. Thank you, Roberts.